UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ex parte Application of RTI LIMITED to Take Discovery for Use in Actions Pending in the District Court of Nicosia, Cyprus, and Anticipated in the Court of Moscow, Russia

Case No. 12-misc-119

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782**

Baker & Hostetler LLP
Timothy S. Pfeifer (tpfeifer@bakerlaw.com)
M. Elizabeth Howe (bhowe@bakerlaw.com)
45 Rockefeller Plaza
New York, NY 10111
212-589-4200 (tel.)
212-589-4201 (fax)

*Attorneys for RTI Limited*

RTI Limited ("Petitioner" or "RTI"), by its undersigned counsel, respectfully submits this memorandum of law in support of its Application for an order authorizing Petitioner to take discovery from four domestic banking institutions in this district under 28 U.S.C. § 1782(a) for use in foreign proceedings.

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

RTI seeks this Court's authorization to take discovery in this district for use in: (i) two foreign proceedings pending in the Republic of Cyprus; and (ii) a planned action in the Russian Federation (the "Foreign Proceedings"). These proceedings are part of a global effort by the United Company Rusal PLC[1] group of companies ("Rusal Group"), of which Petitioner is a member,[2] to root out a network of corruption, fraud, and kickbacks led by former Rusal Group employee Andrey Borisovich Raykov ("Raykov"), a Russian national.

Four banking institutions present in the United States possess critical evidence related to these actions: The Bank of New York Mellon Corporation ("BONY"), Deutsche Bank Trust Company Americas, JPMorgan Chase Bank N.A., and Citibank N.A. (collectively, the "Domestic Banks"). All four of the Domestic Banks are headquartered in New York, New York, and regularly do business in this Judicial District. Each of the Domestic Banks served as correspondent and/or other intermediary banks in transactions undertaken in furtherance of Raykov's fraudulent scheme. Hence, the Domestic Banks possess critical evidence that the Petitioner and the Rusal Group will use in furtherance of the Foreign Proceedings and identifying further fraudulent conduct by Raykov and his co-conspirators.

---

[1] United Company Rusal PLC is a Jersey-registered holding company with its headquarters in Moscow, Russia, and dozens of subsidiaries around the world. It is in the business of producing and selling aluminum.

[2] The Petitioner is a Jersey-registered, 100% owned subsidiary of United Company Rusal PLC and carries out much of the Rusal Group's aluminum trading.

## I. DISCOVERY OF FRAUD AGAINST THE RUSAL GROUP

In early 2011, the Rusal Group identified certain information strongly suggesting that Raykov – who is currently a fugitive from justice – received unlawful kickbacks from third-parties doing business with members of the Rusal Group. Raykov was able to able to arrange and conceal these kickbacks by virtue of his former position as the General Director of Russian Aluminum Management ("RAM"), a member of the Rusal Group that managed certain other Rusal Group entities. At other relevant times, Raykov held managerial posts with several of the Rusal Group entities. By exploiting his various roles at the Rusal Group, Raykov was able to execute multiple concurrent schemes to siphon and conceal funds that belong to the Rusal Group. The Rusal Group is still determining the full extent of Raykov's illegal conduct and the scope of his defalcation is still to be determined.

### A. Fraud in Shipping Contracts and Subsequent Legal Action in Cyprus

Raykov's first scheme involves skimming payments from certain of the Rusal Group's shipping contracts. On the basis of investigations and evidence gathered internally, on or about May 23, 2011, four directly-affected members of the Rusal Group[3] applied for an ex parte order of disclosure against Hellenic Bank Public Company Ltd., Nicosia (Cyprus) branch ("Hellenic Bank"), for information related to suspect transactions involving Raykov. The Rusal Group brought this ex parte action in the District Court of Nicosia, Cyprus (the "First Cyprus Action")[4] against six defendants: Raykov, Aldi Marine Ltd. ("Aldi Marine"), Dimitry Osipov ("Osipov"), Natica Shipping Ltd. ("Natica Shipping"), Natica Shipping and Trading Ltd., and Hellenic Bank.

---

[3] Rual Trade Ltd., Alumina & Bauxite Company Ltd., Calibre Properties Worldwide Ltd., and Mon Cervin – Consultadoria e Servicos Sociedade Unipessoal LDA (the "Initial Cyprus Plaintiffs").

[4] See Rual Trade Ltd., et al. v. Raykov, et al., Eparchiako Dikasthrio Leukosias [EDL] [District Court, Nicosia] 3582/2011, p. 1 (Cyprus); see also Exhibit 1 to the attached Declaration of Timothy S. Pfeifer in Support of Application for an Order Under 28 U.S.C. § 1782 ("Pfeifer Decl.").

Defendant Aldi Marine is a shipping broker controlled by Osipov, another defendant in the Cyprus Action. See Pfeifer Decl. Exhibit 1 at ¶ 5. Osipov represented himself to the Initial Cyprus Plaintiffs as the Managing Director of Natica Shipping. Id. ¶ 11. As alleged in the Initial Cyprus Plaintiffs' court filings, Raykov abused his authority at the Rusal Group to ensure that the majority (if not all) of the Rusal Group's shipping charters were conducted with or through Natica Shipping, such that Natica Shipping eventually became the sole and exclusive shipping broker for the Rusal Group. Id. Once Natica Shipping took on this exclusive role, Raykov and Osipov manipulated the Initial Cyprus Plaintiffs into entering shipping and freight contracts with Osipov-controlled entities with what was effectively a mark-up in price. Id. ¶ 14. Raykov and Osipov pocketed the mark-up. Id. ¶¶ 13-14, 21-22. Raykov and Osipov then simultaneously concealed the nature of the deal from the Initial Cyprus Plaintiffs, preventing them from realizing that Aldi Marine was overcharging for provision of shipping services and pocketing the difference. Raykov thereafter received several payments from Aldi Marine – mischaracterized in emails to Raykov from Hellenic Bank as "bonuses," although no such bonuses were authorized by the Rusal Group. Id. ¶¶ 16-17. It is the Rusal Group's position that these "bonuses" are illicit kickbacks.

This position has been confirmed by disclosures by Hellenic Bank. On or about June 8, 2011, Hellenic Bank disclosed documents reflecting debits from, and credits to, an account held by Raykov between 2000 and 2010 ("Disclosure"). See generally Pfeifer Decl. Exhibit 2. In 2007, Raykov received three payments totaling $669,022 from defendant Aldi Marine. Id. at RUS000031, RUS000070, RUS000071, RUS000073; Pfeifer Decl. Exhibit 1 at ¶¶ 19-20. The Initial Cyprus Plaintiffs believe that these three payments are likely the tip of an iceberg of illicit kickbacks funded by money that belongs to the Rusal Group.

On April 11, 2012, the District Court Judge in the First Cyprus Action froze $669,022 of the balance on deposit in Aldi Marine's bank account as part of the ongoing litigation.

### B. The Necessity of Further Discovery

The First Cyprus Action is still pending, and the Initial Cyprus Plaintiffs are in the process of seeking evidence of additional malfeasance by Raykov. Further discovery is necessary for the First Cyprus Action because the information contained in the Disclosure is insufficient to enable the Initial Cyprus Plaintiffs to determine whether Raykov received any other apparently improper payments and/or kickbacks. The Disclosure only partially reveals the scope of Raykov's illicit activities. For example, although the Disclosure includes documents that show the source or destination of many of the funds transferred through the relevant accounts, in several cases the documents merely show the date and amount of a given transfer without providing further highly relevant detail, such as recipients or sources of funds or information on the reasons for the transfer. See, e.g., Pfeifer Decl. Exhibit 2 at RUS000027. Moreover, the Disclosure does not identify all of the banks through which Raykov's U.S. dollar-denominated transfers cleared. See, e.g., id. at RUS000026. Based on the Disclosure, the Initial Cyprus Plaintiffs believe that these transfers represent only one key aspect of Raykov's fraud that will lead to information further regarding similar transfers. The Petitioner and the Initial Cyprus Plaintiffs believe that the Disclosure demonstrates that this Application will yield critical evidence in support of the foreign proceedings.

## II. RAYKOV'S FRAUD IN BAUXITE CONTRACTS

### A. Contracts with Bauxtrade Ltd.

The Disclosure demonstrates that Raykov exploited certain other Rusal Group contracts that he supervised for the sale of bauxite (aluminum ore). Raykov was charged with finding brokers and shipping companies to transport good for various members of the Rusal Group,

including Bauxite Company of Guyana, Inc. ("BCG"). See Pfeifer Decl. Exhibit 3 at ¶¶ 5, 10. On information and belief, in accordance with his duties as General Director of RAM, his various other high positions in the managerial companies in the Rusal Group, and his informal connections within the Rusal Group, Raykov sent to the then-director of BCG certain contracts to sell bauxite to Bauxtrade Ltd. ("Bauxtrade"). Id. at ¶ 11. As set forth in detail below, Raykov appears to have received kickbacks from Bauxtrade for inducing the Rusal Group to enter these contracts.

The Disclosure reflects five suspect 2008 payments to Raykov's Hellenic Bank account totaling $570,120 by Bauxtrade and Vestconsul Limited ("Vestconsul"), which appear to be related entities. See Pfeifer Decl. Exhibit 2 at RUS000074-RUS00077, RUS000079. Materials in the Disclosure strongly suggest that Bauxite and Vestconsul acted in concert and are complicit in Raykov's kickback scheme.

For example, documents concerning an October 9, 2008 transfer to Raykov's Hellenic Bank account describe the payor's details as follows: "Vestconsul Limited Walkers Chambers Roadtown Tortola Britis (sic) Virgin Islands (********3070)." Id. at RUS000076. The payor's details for the April 6, 2009 transfer are as follows: "Bauxtrade Limited, Walkers Chambers Roadtown Tortola, British Virgin Islands (*******3070)."[5] Id. at RUS000077. Vestconsul and Bauxtrade have the same address and apparent bank account number. By September 16, 2009, however, the revealing mistake is corrected. The transfer provides the payor's details as "Bauxtrade Limited, Hilbert Shields, A143 Robin's Place West Bel Air Park Georgetown Guyana (********8678)." Id. at RUS000079.

[5] This appears to be an account number. The number has been redacted for the purposes of this Application, but records contained in the Disclosure confirm it is identical to the apparent account number for Vestconsul.

The payments that Vestconsul and Bauxtrade sent to Raykov appear to be directly linked to the performance of the Rusal Group's bauxite contracts with Bauxtrade as set forth above. Per the terms of these two contracts, BCG agreed to sell 170,000 tons of bauxite to Bauxtrade between January 1, 2006 through December 31, 2008, and later agreed extend the earlier contract to the end of 2009. See Pfeifer Decl. Exhibit 3 at ¶¶ 11-12. Six vessels were chartered in 2008 and 2009 as part of these sales contracts: (i) MV UBC SANTA MARIA; (ii) MV UBC SYDNEY; (iii) MV SWIFT SPLASH; (iv) MV PIONEER STAR; (v) MV C.S. STAR; and (vi) MV BORC. Id. at ¶14.

Documents in the Disclosure relating to four suspect payments to Raykov's personal bank account expressly reference vessels chartered as part of the performance of the Bauxtrade contracts:

- The August 27, 2008 transfer of $107,615 by Vestconsul to Raykov refers to the "M.V. SWIFT SPLASH";
- The October 9, 2008 transfer of $120,390 by Vestconsul to Raykov refers to the "MV BORC AND UBC SYDNEY";
- The April 6, 2009 transfer of $129,965 by Bauxtrade to Raykov refers to the "MV SANTA MARTA (sic)"; and
- The September 16, 2009 transfer of $111,449 by Bauxtrade to Raykov refers to the "MV PIONEER STAR."[6]

See Pfeifer Decl. Exhibit 2 at RUS000074-RUS00077, RUS000079. Based on the above, the Rusal Group has alleged that the payments to Raykov's personal bank account from Vestconsul and Bauxtrade are kickbacks related to the performance of the contracts he induced BCG to enter. See Pfeifer Decl. Exhibit 3 at ¶¶ 17, 23. Disclosure documents reflect that the "sending bank" in each of the five suspect transfers from Vestconsul or Bauxtrade to Raykov's Hellenic Bank account was BONY. See Pfeifer Decl. Exhibit 2 at RUS000074-RUS00077, RUS000079.

[6] Only one of the five transfers (the first), which was made by Vestconsul on August 8, 2008, does not refer to any particular vessel, but states only "PAYMENT OF INVOICE – FREIGHT CONSULTANCY." See Pfeifer Decl. Exhibit 2 at RUS000074.

### B. The Second Cyprus Action

On the basis of the foregoing evidence, members of the Rusal Group have filed an additional civil action in the Court of Nicosia, Cyprus against Raykov and others for fraud based on their receipt of kickbacks of at least $570,120 from the contracts with BCG (the "Second Cyprus Action).[7] The other defendants in the Second Cyprus Action include: Vestconsul; Bauxtrade; Hilbert Shields, the General Director of Bauxtrade; Ramdeo Kumar, the Financial Manager of BCG, and Hellenic Bank.[8] See Pfeifer Decl. Exhibit 3 at ¶¶ 5-13, 19.

This Application is also made in support of the Second Cyprus Action; discovery over BONY and the remaining Domestic Banks will allow the Petitioner and the plaintiffs in the Second Cyprus Action access to critical information regarding the relationships between the defendants, the scope of the apparent kickback scheme, and the amounts of any ill-gotten gains obtained by Raykov and his co-conspirators.

## III. THE ANTICIPATED RUSSIAN ACTION

### A. Application for Commencement of Criminal Proceeding in Russia

Petitioner and the Rusal Group have applied to the Russian authorities to commence a proceeding against several defendants in the First and Second Cyprus Actions for similar illicit conduct (the "Russian Action").[9] Raykov and Osipov appear to have conspired in connection with a long-term maritime freight contract entered by members of the Rusal Group and, as before, Raykov received kickbacks for his role in the scheme. Beginning in 2003, United Company Rusal ("UCR"), while represented by Natica Shipping, concluded freight services

---

[7] See Bauxite Company of Guyana, Ltd. et al. v. Raykov, et al., Eparchiako Dikasthrio Leukosias [EDL] [District Court, Nicosia] 2058/2012, p. 1 (Cyprus). Plaintiffs in the Second Cyprus Action include two members of the Rusal Group: BCG and United Company Rusal Alumina Ltd.

[8] Hellenic Bank was named as a defendant solely for the purpose of obtaining further discovery, if possible, regarding the suspect transactions.

[9] See Pfeifer Decl. Exhibit 5, which is an application to the Russian police authorities dated February 2, 2012 by A. B. Grokhotov (the "Russian Application"); Mr. Grokhotov is Russian counsel for Petitioner.

agreements ostensibly with the three companies: Mercury Shipping & Trading Ltd. ("Mercury"), RANS Chartering Ltd., and Maguire International. Id. at RUS000115. Each of these three companies, however, was actually an intermediary. The shipping for which UCR had contracted was in fact performed by three other companies: Oldendorff Carriers Ltd. ("Oldendorff"), Cosco Bulk Carrier Co. Ltd., and Sunwoo Merchant Marine Co. Ltd. Id.

As set forth in the Russian Application, Petitioner and the other members of the Rusal Group contend that Raykov, together with beneficial owner of Natica Shipping, Osipov, as well as Elena Shipulina ("Shipulina"), Natalya Averianova ("Averianova"), and Galina Ardatova ("Ardatova"), deceived the management of UCR by representing that Mercury was affiliated with Oldendorff – that it was the latter's subsidiary. Id. at RUS000115. In fact, according to its incorporation documents, Mercury was an entity completely controlled by Osipov. Id. Osipov was the sole director of Mercury from September 22, 2002 to September 26, 2002, after which his mother, Maya Osipova, became the sole director. Id. Moreover, the agreements with the actual shipper (Oldendorff) were signed by Osipov as broker and were performed unbeknownst to UCR. Id. All of this conduct was in violation of Raykov's duties to his employers at the Rusal Group.

During the execution of the above-described scheme, Ardatova was the head of the freight department and was in charge of UCR's shipments. Ardatova had previously attended school with and worked with Osipov. Id. at RUS000116. As described in the Russian Application, Ardatova, Shipulina, and Averianova, received significant transfers from Mercury to their personal bank accounts in 2004 and 2005. In 2005, Ardatova received $1.37 million from Mercury. Shipulina and Averianova received $30,000 and $25,000, respectively. Id. at 3. The Rusal Group believes, and has so informed the Russian criminal authorities, that these

payments are kickbacks received for assisting in the scheme to induce UCR to enter contracts with Osipov's companies for his and Raykov's personal benefit.

**B. The Necessity of U.S. Discovery for the Russian Action**

The evidence sought here is necessary to support the Russian Action for at least two reasons. First, no evidence or cooperation from Raykov can reasonably be expected as he is a fugitive from Russian justice and has fled that country. Raykov is already the subject of two criminal cases against him in Russia.[10] The two consolidated pending actions are both for fraud/embezzlement and were brought at the request of members of the Rusal Group and one of the Rusal Group's parent companies.[11]

Second, the Russian criminal authorities' ability to obtain evidence outside of Russia – where the bulk of the evidence in this case is likely to be found – is limited. Discovery here as to the Domestic Banks through which Raykov appears to have operated is expected to provide admissible evidence more quickly and efficiently than discovery by means of mutual legal assistance treaties.

Finally, this Application would allow the Petitioner and the other members of the Rusal Group to identify additional theft from the Rusal Group by allowing discovery into the existence, timing, and amount of other transactions among the parties described above.

---

[10] As detailed in the August 30, 2011 decision by the Tver District Court of Moscow, Raykov also appears to have induced several members of the Rusal Group to enter suspect aluminum contracts with the aid of unidentified Rusal Group employees for which he also received "bonuses" through Russian banks. See Pfeifer Decl. Exhibit 4 at RUS000104-RUS000105. In connection with his pending criminal charges, Raykov was arrested on July 7, 2011, but released under his own recognizance the next day, pending a further court hearing. Id. at RUS000105-RUS000106. He did not appear at the hearing. Rather, on or about July 11, 2011, he fled to Belarus. Thereafter, on information and belief, he traveled to Europe, the United States, and the United Kingdom. He is currently on Russia's international wanted list and is suspected to be somewhere in the United Kingdom.

[11] Based on the Rusal Group's investigation to date, the two pending Russian cases do not appear to relate to any of Raykov's activity through the Domestic Banks. Although this Application does not request relief in support of those actions, given the pattern of activity by Raykov and his confederates in relation to their Hellenic Bank transactions, in all likelihood evidence will likely be revealed in the course of discovery here that may assist in those pending proceedings as well because Raykov's schemes are interrelated.

## ARGUMENT

### I. PETITIONER MEETS THE REQUIREMENTS OF 28 U.S.C. § 1782(A)

Under 28 U.S.C. § 1782(a), "[t]he District Court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in proceedings in a foreign or international tribunal, including criminal investigations conducted before formal accusations. . . ." The "twin aims of the statute" are to "provid[e] efficient means of assistance to participants in international litigation in our federal courts and encourage[e] foreign countries by example to provide similar means of assistance to our courts." Brandi-Dohrn v. IKB Deutsche Industriebank AG, No. 11-4851-CV, 2012 WL 695541, at *4 (2d Cir. Mar. 16, 2012) (citing Schmitz v. Bernstein Liebhard & Lifshitz LLP, 376 F.3d 79, 83 (2d. Cir. 2004)).

The Second Circuit has interpreted this provision as authorizing the Court to grant an application for discovery under 28 U.S.C. § 1782(a) only where:

(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made,

(2) the discovery is for use in a foreign proceeding before a foreign tribunal, and

(3) the application is made by a foreign or international tribunal or any interested person.

Brandi-Dohrn, 2012 WL 695541, at *4 (quoting In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery, 121 F.3d 77, 79 (2d Cir. 1997)).

Petitioner's Application satisfies each requirement. First, the parties from whom discovery is sought are "found" in this District. A company is found where it is incorporated, headquartered, or where it is engaged in "systematic and continuous activities." In re Godfrey, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (citation omitted). Each of the Domestic Banks is headquartered in New York, New York, and each do business there.

Second, the First Cyprus Action, Second Cyprus Action, and Russian Action all qualify as "proceedings in a foreign . . . tribunal." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 258-59 (2004) (noting that in the context of 28 U.S.C. § 1782(a) "Congress[] recogni[zes] that judicial assistance would be available 'whether the foreign or international proceeding or investigation is of a criminal, civil, administrative, or other nature'" and "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings"; such proceedings must merely "be within reasonable contemplation"). The First Cyprus Action and Second Cyprus Action are already pending, and the Russian Action is "reasonabl[y] contemplate[ed]." Intel Corp., 542 U.S. at 259. An application to commence the Russian Action has already been submitted and the evidence supporting Russian causes of action against Raykov and his confederates is already being gathered. Rusal Group has already submitted successful applications for the authorities to commence two similar proceedings in Russia based on other evidence related to Raykov's crimes.

Finally, the Petitioner is an "interested person" within the meaning of 28 U.S.C. § 1782(a). See Intel Corp., 542 U.S. at 256 (stating that the term "interested person" is intended to include not just "litigants before foreign or international tribunals" but any "complainant [who] 'possess[es] a reasonable interest in obtaining [judicial] assistance'") (citation omitted). The Foreign Proceedings will help determine the scope of the fraud against the Rusal Group by some of its own trusted employees, which will have implications for all the interconnected Rusal Group entities. Petitioner, along with the other Rusal Group entities, is a victim of Raykov's crimes. Raykov's corruption of bauxite and freight contracts entered by members of the Rusal Group is the basis of the Foreign Proceedings and this Application. Petitioner carries out the majority of the Rusal Group's aluminum trading operations, which rely on the very bauxite and

freight contracts Raykov manipulated at the Rusal Group's expense. For these same reasons, Petitioner is closely connected to the members of the Rusal Group who are plaintiffs in the First and Second Cyprus Actions, and share Petitioner's interest in the outcome of those proceedings.

Under these circumstances, this Court is authorized to grant the Application under 28 U.S.C. § 1782(a).

## II. DISCRETIONARY CONSIDERATIONS MERIT GRANTING OF THIS APPLICATION

In addition to satisfying Section 1782(a)'s statutory requirements, certain discretionary factors that "bear consideration in a ruling on a § 1782 request" also favor granting this Application. Intel Corp., 542 U.S. at 264-65.

First, Petitioner's need for discovery as to the Domestic Banks by means of Section 1782(a) is made more "apparent" by the fact that these parties are not, and are not likely to be, participants in any of the Foreign Proceedings. Id. As the Supreme Court noted, "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." Id. As such, relief under Section 1782(a) may not be warranted where the relevant foreign tribunal does not need the assistance. Id. Here, the Domestic Banks possess evidence relevant to the Foreign Proceedings, but are not accused or even suspected of any wrongdoing. The Domestic Banks are not likely to be brought before any foreign tribunals for the production of the responsive documents in their possession. The fact that none of the Domestic Banks is a participant in the Foreign Proceedings weighs in favor of granting the Application.

Second, both the Court of Moscow, Russia, and the District Court of Nicosia, Cyprus are likely to be receptive to this Court's assistance in discovery. "[A] court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or

agency abroad to U.S. federal-court judicial assistance." Id. The proceedings already underway and anticipated abroad concerning Raykov's kickback scheme are part of the Rusal Group's reasonable efforts to uncover criminal activity and reverse damage done to the Rusal Group by corrupt employees.

Courts in this and other Circuits have granted Applications under Section 1782(a) in furtherance of Russian and Cypriot proceedings. See, e.g., In re Imanagement Servs., No. Misc. 05-89(FB), 2005 WL 1959702, at *5 (E.D.N.Y. Aug. 16, 2005) (granting Section 1782(a) application for discovery from BONY's predecessor, Bank of New York, even where evidence might not ultimately be admissible in Russian court, because it could lead to further evidence and the Russian tribunal would be free to accept or reject U.S. assistance); Weber v. Finker, 554 F.3d 1379 (11 Cir. 2009) (upholding district court grant of Section 1782(a) petition by plaintiff in proceedings in Cyprus and Switzerland). Therefore, the nature of the Foreign Proceedings and the receptivity of the Russian and Cypriot foreign tribunals also weigh in favor of granting the Application.

Third, the Petitioner has not made this Application as a means of circumventing discovery limits set by the tribunals involved in the Foreign Proceedings. "[A] district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign-proof gathering restrictions or other policies of a foreign country or the United States." Intel Corp., 542 U.S. at 264-65. Courts have interpreted this discretionary factor as an inquiry into the petitioner's good faith. In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf, No. M19-88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006). Petitioner's Application here is in good faith.[12] The evidence sought from the Domestic Banks is not beyond the scope allowed by

[12] Courts should exercise their discretion to deny applications under Section 1782(a) where the "discovery is being sought for the purposes of harassment." Brandi-Dohrn, 2012 WL 695541, at *4 (citing Euromepa S.A. v. R.

the courts in Cyprus and Russia, as evidenced by the District Court of Nicosia's prior disclosure order on Hellenic Bank and the examination of bank records in the pending Russian criminal proceedings. See generally Pfeifer Decl. Exhibit 2; Pfeifer Decl. Exhibit 5 at 2. The Domestic Banks are outside those tribunals' jurisdictional reach for the purposes of discovery. Consequently this factor also weighs in favor of granting the Application.

Fourth, any discovery under the subpoenas will not be onerous for the Domestic Banks. Courts may consider whether discovery requests under Section 1782 are "unduly intrusive or burdensome" and should be "rejected or trimmed." Intel Corp., 542 U.S. at 265. Here, the Petitioner seeks only that the Domestic Banks produce records limited to certain identified (or identifiable) individuals, entities, and transactions. Hence, this factor also weighs in favor of granting the Application.

**CONCLUSION**

For all of the foregoing reasons, this Court should grant Petitioner's Application under 28 U.S.C. § 1782(a) and enter an order authorizing discovery from the Domestic Banks.

Dated: April 13, 2012

Respectfully submitted,

Timothy S. Pfeifer (tpfeifer@bakerlaw.com)
M. Elizabeth Howe (bhowe@bakerlaw.com)
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
212-589-4200 (tel.)
212-589-4201 (fax)

*Attorneys for RTI Limited*

Esmerian, Inc., 51 F.3d 1095, 1101 n.6 (2d Cir. 1995)). That is not the case here. The Domestic Banks possess evidence crucial to the Foreign Proceedings.